Affirmed as Modified and Memorandum Opinion filed January 17, 2006









Affirmed
as Modified and Memorandum Opinion filed January 17, 2006.

 

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-04-00256-CV

____________

 

WAYNE BOSTOW, Appellant

 

V.

 

BANK OF
AMERICA, Appellee

_________________________________________________________________

 

On Appeal from the 157th District Court

Harris County, Texas

Trial Court Cause No. 01-46935

_________________________________________________________________

 

M E M O R A N D U M   O P I N I O N








This case arises out of a dispute between a bank and a
depositor that culminated in a lawsuit by the bank to terminate its banking
relationship with the depositor.  The
trial court entered a temporary injunction to stop the depositor Afrom unilaterally acting to keep
deposit accounts open.@  The depositor filed
counterclaims asserting breach of the deposit agreement and a variety of tort
claims.  After a trial, the jury found
(1) the bank failed to comply with the deposit agreement and (2) the depositor
improperly continued to make deposits in his accounts to keep the accounts
open.  In nine appellate issues, the
depositor now challenges the trial court=s judgment and its rulings on various
pretrial matters.  We find merit in only
one of the depositor=s appellate pointsChis contention that he is entitled to
post-judgment interest at the legal interest rate of five percent per
year.  Accordingly, we reform the
judgment to reflect this post-judgment interest rate, and, as modified, we
affirm the judgment.[1]

I.  Factual and Procedural Background

Appellant/defendant Wayne Bostow maintained deposit accounts
at appellee/plaintiff Bank of America (hereinafter the ABank@). 
The parties agreed that their written Deposit Agreement would govern all
deposit accounts Bostow established with the Bank.  In the Deposit Agreement, the parties
expressly agreed that the Bank Amay terminate this agreement and close [Bostow=s] account at any time without prior
notice.@ 


Notification of the Bank=s Termination of the Banking
Relationship

At some point in 1998, Bostow experienced problems with his
accounts at the Bank.  He claimed to have
discovered discrepancies in the Bank=s recordkeeping and complained about
it to various representatives of the Bank. 
The parties engaged in a series of communications that culminated in the
Bank informing Bostow, in March 1999, that under the Deposit Agreement, the
Bank had elected to terminate its banking relationship with Bostow.  Although the Bank attempted to close Bostow=s accounts, Bostow managed to keep
them open by making deposits after the Bank informed him the accounts would be
closed.  








Depositor=s Conduct After Notification of
Termination of Banking Relationship

Over the next two years, Bostow wrote
many letters and also engaged in many face-to-face communications with several
of the Bank=s managers and tellers.  The Bank alleged that during this time,
Bostow harassed or intimidated its employees and engaged in other conduct the
Bank deemed threatening or otherwise inappropriate.  For example, in December 2000, Raymond
Jackson, an officer in the Bank=s corporate security department, received a complaint from
one of the banking centers that Bostow was possibly stalking one of the Bank=s tellers.[2]  The Bank=s management decided to transfer the
teller to the motor bank, which is a separate building, Aso there wouldn=t have to be a face-to-face
confrontation@ between the teller and Bostow.

A few days after the teller=s initial complaint about Bostow, the
Bank wrote Bostow a letter, again advising him that the Bank had elected to
close his accounts and also asking him to refrain from making further deposits
or writing additional checks. 
Additionally, the Bank asked Bostow to make other banking arrangements.
Bostow refused to accept the Bank=s letter, and it was returned
unopened to the Bank.  The Bank sent
other letters to Bostow and these, too, were returned unopened.  Bostow indicated in a January 2001 letter explaining
the return of these items that he would accept mail only from a Aserviceable address@ and Anot a post office box.@ 
The next week the Bank sent Bostow a cashier=s check to close his certificate of
deposit.  However, the matter still was
not resolved.








The Bank and Bostow continued to correspond.  Bostow complained about the treatment he had
received from the Bank=s corporate security officer (Jackson) and asked that his
case be reassigned to someone authorized to restore his account status at the
Bank.  Through Brian Anderson, its
Executive Customer Relations Officer, the Bank reiterated that it had elected
to terminate its banking relationship with Bostow and requested Bostow to make
arrangements to remove items from his safe deposit box and return the key to
the Bank.  Shortly thereafter, the Bank
wrote Bostow another letter requesting that he no longer come onto the Bank=s property.

Despite the Bank=s many requests, Bostow continued to
make deposits to his accounts. Although Bostow=s accounts had a Aclosed@ status in the Bank=s system, Bostow could activate the
accounts by making deposits.  Apparently,
the Bank=s internal system permitted this
activity and so it proved very difficult for the Bank to bring its banking
relationship with Bostow to an end. 
After the Bank advised Bostow that his accounts were closed, Bostow continued
to make very small deposits.  Consequently,
even though Bostow=s accounts had been Aclosed,@ he was able to keep them open by
making these deposits. 

In May 2001, Bostow sent a letter to one of the Bank=s branch managers offering to take
him to lunch.[3]  The Bank did not change its decision to
terminate the banking relationship.  In
July 2001, the Bank received another letter from Bostow that created a security
concern because it contained references to American submarines killing Japanese
civilians, Peruvian fighters shooting down missionary planes, American bombers
killing soldiers in Kuwait, and the Challenger coming flaming down to
earth. 








The next month, Bostow wrote to a Bank associate complaining
of the Bank=s correspondence and stating, AI hold you personally responsible for
any activities taken by the bank personnel . . . which I guess is you, for
false arrest, false and malicious statements, account theft, delays,
humiliation and the like, most especially at your branch.@ 
Bostow=s letter stated, A[I]n the Army, they used to tell us
about the easy way and the hard way.  (Of
course, the easy way was only easy by comparison.)@ 
The Bank=s security officer (Jackson) testified that he was concerned
about Bostow=s actions and the Aprevious letter and rambling about
killings and murders and things going on in the world.@ 
Bostow=s letter continued, AObviously you wish I could just go
somewhere else and leave you alone . . . let me assure you that will not
happen.@ 
The Bank=s security officer interpreted the statement as a threat,
explaining that, as an investigator, he believed Athat the people at [the Bank] might
be subject to danger by Mr. Bostow.@[4] 
The Bank=s security officer wanted no further communication with
Bostow after this incident.  In his
letter, Bostow stated that if the Bank Areally wants me to leave, it needs to
reach a legal agreement of termination or seek proper legal means to expel and
keep me out.@ After more than two years of
unsuccessful attempts to terminate its banking relationship with Bostow, the
Bank did just that.

The Bank=s Suit for Injunctive Relief

In September 2001, the Bank sued for injunctive relief.  In a section of the petition entitled AClaim,@ the Bank alleges, among other
things, the following:

Bostow has engaged in a consistent pattern of
harassment and abuse towards  [the Bank]
and its employees. . .[The Bank] has attempted to close Bostow=s accounts on several occasions during the last two
(2) years.  However, Bostow has figured
out how to evade the internal measures for closing an account, and has thereby,
through deliberate acts, managed to keep his accounts open by making
inconsequential deposits and transactions.








Although informed that his accounts have been closed,
Bostow refuses to accept this fact and harasses [the Bank] and its
employees.  Instead of seeking a
resolution in a normal manner, Bostow writes threatening letters and stalks [Bank]
employees.  His actions have disturbed
the day to day activities of [the Bank] and of its employees.  These actions have required that some
employees be transferred to other locations that do not require direct contact
with any customers.

Bostow has contacted [Bank] employees via their
personal e-mail and has been seen waiting in his car, observing employees near
quitting time.  Bostow=s actions have caused these employees to fear for
their personal safety.

Attached as Exhibits [to this petition] are copies of
two recent letters sent by Bostow and received by [the Bank].  These letters demonstrate Bostow=s attitude and show his intent to harass [the Bank].

[The Bank] seeks a temporary restraining order, and a
preliminary and permanent injunction against Bostow.  The injunction is to enjoin Bostow from
committing any acts to maintain and keep open any [Bank] accounts he may have.  This injunction is also for the purpose of
enjoining Bostow from entering any [Bank] branches, and to enjoin Bostow from
communicating with any [Bank] employees. 


 

The trial court signed an ex parte temporary restraining order (ATRO@) restraining Bostow from
communicating with the Bank and its employees in writing, by telephone, by
e-mail, by oral conversation, or in any other manner, with the intent to annoy,
harass, or threaten the Bank or its employees. 
In conjunction with the issuance of the TRO, the trial court ordered
Bostow to appear and show cause why he should not be temporarily enjoined from
engaging in the following activities:

(a)       Entering any and all [Bank] branches to make any deposits or
conduct any transactions for the purposes of maintaining and keeping open any
[Bank] accounts in his name;

(b)       Communicating with [the Bank] and/or its employees whether in
writing, by telephone, by email, by oral conversation, or in any other manner,
with the intent to annoy, harass or threaten [the Bank] and/or its employees;

(c)       Walking, standing, sitting or otherwise being within five
hundred (500) feet of any [Bank] location other than for the purpose of
conducting business with other nearby businesses; and

(d)       Interfering with the daily business of [the Bank].

 

The trial court set the amount of the TRO bond at $500.  The trial court also set a hearing on the
Bank=s application for a temporary
injunction.








After an evidentiary hearing, the trial court granted a
temporary injunction restraining Bostow from engaging in the following
activites:

(a)       Entering any [Bank] branch to make any deposit or conduct any
transaction for the purpose of maintaining and keeping open any [Bank] account
in his name;

(b)       Communicating with [the Bank] and/or its employees whether in
writing, by telephone, by e-mail, by oral conversation, or in any other manner,
with the intent to annoy, harass or threaten [the Bank] and/or its employees;
and

(c)       Interfering with the daily business of [the Bank].

 

The trial court also ordered Bostow to communicate with the Bank=s counsel Afor the purpose of conveying all necessary
information as is required to give full effect to the closure of any accounts
of [Bostow] at [the Bank].@  The trial court
ordered the TRO bond transferred to its new order and noted the Bank was not
required to post any further bond for the temporary injunction.  Bostow did not appeal the temporary
injunction.

The Depositor=s Counterclaims

After the trial court signed the temporary injunction, Bostow
filed counterclaims against the Bank asserting breach of contract and various
tort claims, including invasion of privacy, assault, conversion, interference
with legitimate business, and unclean hands. 
Essentially, Bostow alleged that the Bank converted funds from his
accounts, failed to respond to his complaints, invaded his privacy by allegedly
spreading and publicizing confidential information regarding his accounts,
interfered with his normal business routine, and allegedly allowed employees to
engage in assaultive behavior toward him.








Trial and Final
Judgment

The Bank moved for a bifurcated trial
under section 41.009 of the Texas Civil Practice and Remedies Code, and the
trial court granted the motion.  The case
was tried to a jury, which found that the Bank failed to comply with the
Deposit Agreement and that Bostow was damaged in the amount of $200.  The jury also found that Bostow improperly
continued to make deposits in his accounts to keep the accounts open. The trial
court signed a final judgment awarding Bostow damages of $200 on his contract
claim and a take-nothing judgment in favor of the Bank on the rest of his
claims.  The final judgment also
contained a permanent injunction prohibiting Bostow from engaging in the
following activites:

1.         Entering any and all [Bank] branches to make any deposits,
or conducting any transactions for the purposes of maintaining and keeping open
any [Bank] accounts in his name;

2.         Communicating with [the Bank] and/or its employees whether
in writing, by telephone, by e-mail, by oral conversation, or in any other
manner, with the intent to annoy, harass or threaten [the Bank] and/or its
employees; and

3.         Interfering with the daily business of [the Bank].

 

Challenging the trial court=s judgment, Bostow raises nine issues
on appeal, each of which is addressed below.

II. 
Propriety of Permanent Injunction 








In his first issue, Bostow alleges there are no findings to
support the minimum requirements of an extraordinary remedy and that earlier Aresults should be reversed due to
unfair stigma resulting from false, spurious, and groundless charges@ in the original petition.  Many of Bostow=s arguments relate to the TRO.  There is no appeal from the issuance of a
TRO.  See Nikolouzos v. St. Luke=s Episcopal Hosp., 162 S.W.3d 678, 680 (Tex. App.CHouston [14th Dist.] 2005, no pet.)
(en banc).  Moreover, the TRO expired
long before this court acquired jurisdiction of this case. Finally, Bostow did
not appeal the temporary injunction. 
Thus, the issues Bostow raises regarding the alleged impropriety of the
TRO and the temporary injunction are moot. 
See Isuani v. Manske-Sheffield Radiology Group, P.A., 802 S.W.2d
235, 236 (Tex. 1991).  

Though Bostow forcefully asserts the permanent injunction was
improperly issued, he fails to articulate a clear statement of his complaint on
appeal.  Because he alleges generally
that A[t]he grant of permanent injunctive
relief does not meet legal tests,@ we treat the issue as an assertion
that the trial court clearly abused its discretion in granting a permanent
injunction based on the jury=s findings and the evidence at trial.

Permanent injunctive relief is appropriate upon a showing of
the following elements: (1) the existence of a wrongful act, (2) the existence
of imminent harm, (3) the existence of irreparable injury, and (4) the absence
of an adequate remedy at law.  Jim
Rutherford Invs., Inc. v. Terramar Beach Cmty. Ass=n, 25 S.W.3d 845, 849 (Tex. App.CHouston [14th Dist.] 2000, pet.
denied).  A court determining the
appropriateness of a permanent injunction should balance the competing
equities, including the public interest. 
See Triantaphysllis v. Gamble, 93 S.W.3d 398, 402 (Tex. App.CHouston [14th Dist.] 2002, pet.
denied).








In an appeal from a permanent injunction, the standard of
review is clear abuse of discretion.  Tyra
v. City of Houston, 822 S.W.2d 626, 631 (Tex. 1991); Harris County
Emergency Serv. Dist. No. 1. v. Harris County Emergency Corps, 999 S.W.2d
163, 167 (Tex. App.CHouston [14th Dist.] 1999, no pet.).  A trial court abuses its discretion by (1)
acting arbitrarily and unreasonably or (2) misapplying the law to the
established facts of the case.  Downer
v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241B42 (Tex. 1985).  Although a party to an equitable action has
the right to a trial by jury, only ultimate issues of fact are submitted for
jury determination. The jury does not determine the expediency, necessity, or
propriety of equitable relief. State v. Texas Pet Foods, Inc., 591 S.W.2d
800, 803 (Tex. 1979); Shields v. State, 27 S.W.3d 267, 272 (Tex. App.CAustin
2000, no pet.). The decision to grant an injunction based on ultimate issues of
fact found by the jury is for the trial court itself exercising its chancery
powers.  Texas Pet Foods, 591
S.W.2d at 803; Shields, 27 S.W.3d at 272.  The jury=s
findings on issues of fact are binding; however, equitable principles and the
appropriate relief to be afforded by equity are only to be applied by the court
itself.  See Shields, 27 S.W.3d at
272.  Because the court alone fashions
equitable relief, it is not always confined to the literal findings of the jury
in designing the injunction.  Id.

The jury found that Bostow
improperly continued to make deposits in his accounts to keep the accounts
open, and there is ample evidence in the record to support this finding.  The record also contains evidence that Bostow
engaged in a series of oral and written communications with the Bank that
culminated in Bostow=s
statement that the Bank would need to pursue legal action to enforce the
termination of the banking relationship. 
Bostow wrote letters containing statements the Bank reasonably construed
as threatening.  He made at least one of
the Bank=s tellers
Avery,
very uncomfortable@ causing
the Bank to transfer her to a different location in order to avoid a
face-to-face confrontation with Bostow. 
There were multiple complaints from Bank employees about Bostow,
including one Astalking report@ that he
was seen walking around the personal vehicle of a bank employee near the Bank=s closing
time and that Ait scared everybody at the bank.@  Despite numerous requests from the Bank,
Bostow refused to cooperate in closing his accounts and terminating his banking
relationship.  Bostow=s failure
and refusal to heed the Bank=s
requests to cease and desist this type of activity is some evidence of his
intent to engage in the conduct enjoined by the trial court.








The Bank pleaded and proved a
pattern of harassing conduct by Bostow in which Bostow repeatedly tried to
continue his banking relationship with the Bank even after the Bank had
terminated the relationship.  The jury=s verdict
regarding Bostow=s
harassing behavior in improperly continuing to make deposits to keep his
accounts open constitutes a sufficient finding on the ultimate issue of
fact.  Further, the evidence in the
record supports the trial court=s
decision to grant a permanent injunction based on this finding.  See Shields, 27 S.W.3d at 271B72.  Under the applicable standards of review, we
conclude that the trial court did not clearly abuse its discretion in granting
the permanent injunction in favor of the Bank. 
Accordingly, we overrule Bostow=s first issue.[5]

III.  Alleged Denial of Trial by Jury

In his second issue, Bostow
asserts that the trial court made decisions on facts that were rightfully left
to the jury.  Though his briefing lacks clarity and
precision on this issue, Bostow seems to be asserting that the trial court
erred in not allowing the jury to consider his tort claims.

Bostow asserted four tort theories: (1) conversion; (2)
assault; (3) invasion of privacy; and, (4) interference with legitimate
business.  None of these theories was
submitted to the jury.  Though Bostow now
complains that the jury did not have an opportunity to consider these claims,
there is no indication from the record that Bostow asserted his complaint in
the trial court or that he requested jury submission of any tort theory.  Although he had the opportunity to do so,
Bostow did not raise any of these four theories in his objections to the trial
court=s charge, nor did he request
submission of these issues to the jury. 
Therefore, Bostow has waived his complaint.  See In re A.V., 113 S.W.3d 355, 358
(Tex. 2003).

Moreover, Bostow has failed to direct this court to any
evidence in the record to support any of his tort claims.  Thus, even if Bostow had not waived his
claims by failing to take appropriate action in the trial court, he has failed
to offer record support to this court to show his entitlement to relief.








As to the Bank=s motion for directed verdict, the
trial judge stated, AI=m going to grant the Motion for Directed Verdict for the
reasons I said earlier.@  The trial court
requested counsel to provide an order. 
No written order appears in the record. 
Though Bostow claims error, he cites no authority requiring a separate
written order granting a directed verdict. 
The effect of the trial court=s disposition of the motion is
apparent in the jury charge in that no tort issue was submitted to the
jury.  The record reflects that Bostow
neither submitted proposed jury questions on his tort claims nor articulated
any objection to the jury charge based upon these rejected tort theories.  We conclude Bostow failed to preserve any
error with respect to the court=s charge.  See Tex. R. App. P. 33.1; In re A.V.,
113 S.W.3d at 358 (stating  that
party waived charge error objection on appeal by failing to object in trial
court).  Accordingly, we overrule Bostow=s second issue.

IV. 
Alleged Abandonment of Claim

In his third issue, Bostow asserts the Bank (1) failed to
submit a proposed jury charge which would have established the facts necessary
for an injunction, (2) failed to object to a jury charge in Aphase one,@ which, he claims, could establish
the facts to support a permanent injunction, and (3) later opposed a motion to
continue with Aphase two@ of the bifurcated trial.  Bostow alleges that it was the Bank=s sole responsibility to present
questions which could establish the facts necessary for an injunction and by
failing to do so, the Bank abandoned its claim. 

Bostow=s
argument lacks merit.  Although a
litigant has the right to a trial by jury in an equitable action, only ultimate
issues of fact are submitted for jury determination.  The jury does not determine the expediency,
necessity, or propriety of equitable relief. 
Texas Pet Foods, Inc., 591 S.W.2d at 803.  As discussed above, the jury=s finding
as to Bostow=s harassing conduct is a sufficient
finding on the ultimate issues of fact to support the trial court=s
exercise of discretion in granting a permanent injunction.  Thus, the Bank did not abandon its claim for
injunctive relief by failing to submit fact questions to the jury that would
support its entitlement to injunctive relief. 
Accordingly, we overrule Bostow=s third
issue.








V.  Depositor=s Counterclaims

In his fourth issue, Bostow
argues that fact issues involved in his counterclaims were not settled by the
jury findings and Aremain
alive.@ 
Bostow asserted claims for conversion, assault, invasion of privacy, and
interference with business relationship. 
However, none of these claims were submitted to the jury, and there is
no record that Bostow requested submission of any of these tort theories to the
jury or raised any of these theories in his objections to the court=s charge.  Thus, any error was waived.  See Tex.
R. App. P. 33.1.; Southwestern Bell Telephone Co. v. DeLanney,
809 S.W.2d 493, 495 (Tex. 1991) (holding that [appellant] waived any claim
for breach of contract for failure to request jury questions on the breach of
contract claim).  Accordingly, we
overrule Bostow=s fourth issue. 

VI.  Adequacy of the Trial Court=s Record

In his fifth issue, Bostow
complains about the absence of a transcript from two hearings.  The first is the ex parte hearing on
the TRO.  There is no transcript of this
hearing; however, none is required. 
Moreover, no appeal lies from a TRO so, with or without a record, Bostow
cannot challenge the TRO.  See
Nikolouzos, 162 S.W.3d at 680.

The other hearing presumably
occurred on December 18, 2003, in connection with the Bank=s motion
for entry of judgment four months after trial. 
The final judgment was signed the same day.  The record contains no explanation for the
absence of a transcript.  Bostow has not
shown that the absence of this record constitutes error.  Thus, we overrule Bostow=s fifth
issue.

VII. 
Form of Judgment








In his sixth issue, Bostow asserts the final judgment does
not award statutorily required interest and is otherwise defective.  He contends the trial court erred in not
adequately responding to his requests Ato explain the judgment and to get it
right.@  
The Bank concedes that Bostow is entitled to interest at the legal rate
on the judgment and suggests that the judgment be reformed to state a
postjudgment interest rate of five percent per year. We sustain the portion of
Bostow=s sixth issue challenging the
postjudgment interest rate and reform the judgment to reflect a post-judgment
interest rate of five percent per year.  See
Darby v. Jefferson Life Ins. Co., 998 S.W.2d 622, 630 (Tex. App.CHouston [1st Dist.] 1995, no pet.).

In his sixth issue, Bostow also argues that the permanent
injunction is invalid because it does not state the reasons for issuance.  Texas Rule of Civil Procedure 683, entitled AForm and Scope of Injunction or
Restraining Order,@ states:

Every order granting an injunction and every
restraining order shall set forth the reasons for its issuance; shall be
specific in terms; shall describe in reasonable detail and not by reference to
the complaint or other document, the act or acts sought to be restrained. . . .

Every order granting a temporary injunction shall
include an order setting the cause for trial on the merits with respect to the
ultimate relief sought.  The appeal of a
temporary injunction shall constitute no cause for delay of the trial.

 

Texas courts have applied this rule to temporary injunctions and to suits
requesting ancillary injunctive relief; it does not apply to permanent
injunctions.  See Qaddura v.
Indo-European Foods, Inc., 141 S.W.3d 882, 891B92 (Tex. App.CDallas 2004, pet. denied); Shields,
27 S.W.3d at 273.  Accordingly, we
overrule the remainder of Bostow=s sixth issue.            

VIII.  Alleged Unconscionable Delay








In his seventh issue, Bostow complains in very general terms
about Aunconscionable delay@ in these proceedings, arguing simply
that Ajustice delayed is justice denied.@ 
It is an unfortunate reality that civil litigation can be a lengthy,
time-consuming process and that civil litigants sometimes experience delays in
the prosecution and defense of their lawsuits. 
Bostow does not point to any out-of-the-ordinary delay or particular
harm he has suffered as a consequence, nor does he expound on his Aunconscionable delay@ argument or otherwise develop this
appellate point.  Further, Bostow does
not cite to the record or to any authority to support his argument.  We conclude this issue lacks merit.
Accordingly, we overrule Bostow=s seventh issue.

IX. 
Sanctions

In his eighth issue, Bostow challenges the trial court=s failure to impose sanctions against
the Bank=s lawyer.  Bostow asserts that the trial court judge Aknew or should have known of the
pathological lying@ of the Bank=s counsel, which Bostow alleges Ahas kept this process moving forward.@ 
Bostow refers to this alleged conduct by the Bank=s counsel as Aprosecutorial misconduct,@ a term traditionally used only in
the context of criminal proceedings.  See Ex parte Davis, 957 S.W.2d 9,
22 (Tex. Crim. App. 1997).  Bostow argues
that the trial court erred in not calling for sanctions hearings on its own
motion and urges this court to find the trial court abused its discretion in
not sua sponte imposing sanctions on the Bank=s counsel for the alleged Aprosecutorial misconduct.@

A trial court has inherent power to impose sanctions on its
own motion.  See In re Bennett,
960 S.W.2d 35, 40 (Tex. 1997).  This
inherent power includes the discipline of attorney behavior through the
imposition of sanctions sua sponte in appropriate cases.  Roberts v. Rose, 37 S.W.3d 31, 33
(Tex. App.CSan Antonio 2000, no pet.).   We review the trial court=s decision under an
abuse-of-discretion standard.  Koslow=s v. Mackie, 796 S.W.2d 700, 704 (Tex.
1990).  Bostow argues the trial court
abused its discretion in failing to 
sanction the Bank=s counsel for Apathological lying.@ 
Bostow has provided no record cites in support of his argument nor has
he demonstrated that the trial court abused its discretion.  Accordingly, we overrule Bostow=s eighth issue.

X. 
Injunction Bond








In his final issue, Bostow challenges the adequacy of the
bond for the temporary injunction and asserts this court should set the
injunction bond to what it would have been Ahad the truth been told at the
original ex parte hearing@ and enter a finding of wrongful
injunction.  The issuance of the TRO and
the temporary injunction were rendered moot by the trial court=s issuance of the permanent
injunction.  See Isuani,
802 S.W.2d at 236 (holding the appeals court erred in reaching merits of
interlocutory appeal of temporary injunction after trial court entered
permanent injunction rendering temporary injunction moot).  Bostow may not challenge the propriety of
these orders in this appeal.  We find
these points moot and overrule Bostow=s ninth issue. 

XI.  Conclusion

After reviewing the appellate
record, we conclude that, except for that portion of the sixth issue
challenging the lack of postjudgment interest, Bostow=s
appellate issues lack merit. We reform the trial court=s
judgment to award post-judgment interest at the rate of five percent per year
and affirm the judgment as modified.

 

/s/        Kem Thompson Frost

Justice

 

Judgment
rendered and Memorandum Opinion filed January 17, 2006.

Panel consists of Chief Justice Hedges and
Justices Fowler and Frost.

 

 











[1]  This issue is
not disputed by appellee Bank of America. 





[2]  According to
the security officer, Bostow was being Aoverly
friendly@ with one particular teller and letting other
customers pass him in line so that he could go to this one teller; Bostow=s remarks and comments to the teller were getting more
personal, Apast the normal course of doing business, which made
this associate [teller] very uncomfortable.@  The teller felt Avery, very uncomfortable@ by
Bostow=s Avery personal questions to her@ and reported the incident to her manager, who, in
turn, called the Bank=s corporate security officer.  The security officer testified that when
Bostow was seen walking around the teller=s
personal vehicle close to quitting time Ait
scared everybody in the bank.@





[3]  Bostow asked
the banker for the opportunity to take him along with Aa couple of other branch managers, and a
representative from Security to lunch . . . [to] discuss the past and future of
the bank, its Policies and Procedures both theoretical and in practice, and any
leadership [the bank employee] or others might exert to implement the
transformation called for by your new chairman.@





[4]  Bostow
maintained that Ahe had never been made aware that any fear or
apprehension was involved prior to the lawsuit@ and
that he Anever intended to upset anyone.@  





[5]  In his first
issue, Bostow also asserts that, even if his conduct were considered wrongful,
no finding negates the likelihood that his behavior was Aoffset, justified, and excused by the [B]ank=s breach of contract and failure to communicate.@  Again, the
evidence in the record is sufficient to support the trial court=s granting of a permanent injunction.